## CHALMETTE PETROLEUM CORPORATION v. CHALMETTE OIL DISTRIBUTING CO., Inc.

### No. 10936.

Circuit Court of Appeals, Fifth Circuit.

July 11, 1944.

Rehearing Denied Aug. 15, 1944.

---

Monte M. Lemann, of New Orleans, La., for appellant.

Percy S. Benedict and Ed. J. de Verges, both of New Orleans, La., for appellee.

Before SIBLEY, HOLMES and Mc-CORD, Circuit Judges.

SIBLEY, Circuit Judge.

The appeal is from a decree specifically enforcing an option to buy an oil and gasolene distributing plant in New Orleans, which option was contained in a lease of the plant made in 1939 by appellant to appellee. The sole error specified is that on the evidence the decree should have been otherwise.

The petition, filed in a State court and removed to the district court, sets forth a series of three leases of the distributing plant, the first in 1934, the second a renewal in 1936, and the third in 1939 on a larger rental. Each of them contained an option to the lessee to buy the plant for $50,000 during the term. On June 15, 1940, appellee by a tender of the $50,000 put the appellant in formal default, and thereafter sued for specific performance. Appellant by answer admitted the leases and the offer to exercise the option, but alleged the leases were procured by the recommendation and advice of D. B. Williams, at the time Vice-President and General Manager of appellant, and of R. P. Batson, its Secretary-Treasurer, who, unknown to appellant, had an interest in the lessee corporation and shared in its earnings and profits. On this single ground the lease agreements were sought to be set aside, and an account was prayed from appellee for all earnings and profits made through and by reason of the leases. This defense was the only issue of fact presented by the pleadings.

By interrogatories addressed to appellant, appellee proved its tender and some minor matters, and rested. Appellant thereupon issued subpoenas duces tecum for numerous corporate and bank records, and took the deposition, as of an adversary party, of George P. Gillette, the President of appellee. Gillette testified that he originally subscribed for and always owned all the stock in appellee company, and that neither Williams nor Batson had at any time any interest in the company or its earnings and profits. Appellant then had not only the general burden of proving its defense, but also the task of overcoming the sworn testimony of Gillette. It sought to do this, during a period of months, by circumstantial evidence tending to show that Gillette was unable to raise the $10,000 of the original capitalization, had obtained $2,500 of it by a loan made by one Carter to Williams, afterwards assumed by Batson, but finally paid off by Gillette, as Gillette testified and

bank records tended to show. Another circumstance was that Gillette at first testified that he obtained another $2,500 by borrowing on his life insurance, but it was shown that only about $900 was so obtained, a banker friend testifying that he loaned the difference in addition to a $1,500 loan made by his bank. While the name of Williams or Batson nowhere appeared on appellee's corporate records, or any of the checks drawn against its bank accounts, as testified by auditors who examined them, there was a long series of checks for $200 each regularly issued to Gillette and charged to "salaries", which he deposited in bank to his personal credit; while others for $400, $500 and $600 were charged to "special account", and cashed by him. Gillette testified that the currency thus received by him from the business was in the nature of profits and was placed in a safe at his home, and then used to make investments and for other purposes. The total of these cashed checks was nearly $60,000. Batson's bank account showed many deposits of currency, twenty-five of them on the same days that Gillette had cashed checks, and seven for the exact amount for which Gillette had cashed a check. Gillette testified he had paid Batson no money, and these were mere coincidences, and that Batson would know whence his cash came. There was other evidence which might show cash dealings between Gillette and Williams and Batson. Williams in the fall of 1939 had been asked to resign on account of some crookedness in the business of appellant with which he was charged. Soon afterwards Batson had retired on account of age. Williams was present at court during the trial, but appellant refused to put him on the witness stand, being unwilling to vouch for his credibility. Batson was living in New York, appellant not knowing where, but Gillette offering to furnish his address. Appellee, insisting the burden of proof was on appellant, did not offer as a witness either Williams or Batson.

Another feature of the evidence was the attempt by appellant to show that in urging the directors to make both the first and last leases, Williams and Batson, who alone had full knowledge of the business, had wilfully misrepresented the amount of profits appellant had been making by operating this distributing plant, so as to make it appear a losing business, and exaggerated the savings in overhead to be made by leasing it.

This was not pleaded as a fraud invalidating the leases, and the evidence was objected to for that reason, but the court admitted it. It had some relevance to the pleaded issue as affording an argument that Williams and Batson would have had no reason to run down the plant falsely unless they were interested in the lease. We call particular attention to this contention because the court seems to refer during the trial to this unalleged deceit as a "charge of fraud", not so designating the alleged concealed interest in the lease.

On the evidence thus barely outlined the judge, hearing and seeing Gillette and the other witnesses testify, might have believed Gillette; or because of contradictions, of intrinsic unreasonableness, or the force of suspicious circumstances, he might have disbelieved him. We would in either case hardly be in position to overrule his fact conclusion. Unfortunately we cannot, from the findings of fact made, tell just what the judge considered the truth to be. The formal findings of fact do not mention the pleaded defensive issue, and are simply that the option was given, was exercised, and default was made, entitling appellee to specific performance. Preceding these findings there is an opinion on the law and facts, in which the judge remarks that the word "fraud" nowhere appears in the defendant's answer, but that an "issue of fraud" had been allowed in the case, and that appellant "failed to make out a case of fraud against Chalmette Oil Distributing Co." We think the judge here referred to the proof, allowed over objection, to show affirmative deceit by Williams and Batson. He may have meant that this deceit had not been proven, or that Chalmette Oil Distributing Company had not been connected with it. There is no finding on the main question, whether Williams and Batson were adversely interested in the leases they recommended, or merely helped Gillette, as an old friend, to make a start in business for himself.

The case was tried disjointedly and under great difficulties. We have found it hard to piece the evidence together, and have no distinct conviction as to what the truth is. We think the interests of justice would be served by a new and more orderly trial, which can easily be managed now that the work of uncovering documents and examining records has been done. Williams and Batson certainly know

the truth of the things in dispute. If neither party will risk calling a witness who knows important facts, it is in the power of the court to call and examine such a witness, in the interest of truth and justice, allowing both parties the right of cross-examination and impeachment. We have sanctioned this in a criminal trial, and see no reason why it may not be done in a case like this if the judge, in his discretion, thinks it wise and proper. Young v. United States, 107 F.2d 490. See also 70 C.J., Witnesses, § 723, and cases cited including an equity case, Moore v. Sykes' Estate, 167 Miss. 212, 149 So. 789.

We forbear to discuss at length the law that may be applicable. Specific performance of contracts is allowable under the Civil Code of Louisiana, especially where damages would be inadequate compensation. Arts. 1926, 1927. By special statute written options like this may be specifically enforced. Art. 2462. But the remedy is not of right, but discretionary, according to equity and justice. Tri-State Transit Co. v. Sunshine Bus Lines, 181 La. 779, 160 So. 411. The pleaded defense rests upon the broad principle that an agent, trustee or other fiduciary, who is relied on either to advise or to act, may not bind those he represents when he himself has a secret adverse interest. In this case the full board of directors made these leases, not Williams and Batson. But Williams and Batson were themselves directors, and supposedly best informed about the business, and advised the making of them. If they were to be interested with Gillette in the corporation he was forming to take the leases, they were bound to disclose their interest to their fellow directors and abstain from voting; otherwise the leases would not be good. Especially would this be so if Gillette knew and assisted in the concealment of their interest. See 13 Am. Jur., Corporations, §§ 1002, 1003, 1004; Wardell v. Union Pacific R. R. Co., 103 U. S. 651, 26 L.Ed. 509; McGourkey v. Toledo & Ohio Cent. R. R. Co., 146 U.S. 536, 13 S.Ct. 170, 36 L.Ed. 1079. This would certainly be enough to warrant refusal of specific performance.

The prayer for account of profits presents no pressing question. A trustee, agent, or other fiduciary who buys for himself what his trust empowers him to sell is indeed held to strict account; but Williams and Batson, the fiduciaries here involved, are not before the court and no account is sought from them. Appellee was not a fiduciary. What it made operating the plant would appear to be earnings in its business, rather than a profit made by dealing in trust property.

The printed record is 700 pages. Appellant specified for the transcript on appeal "the complete record of all proceedings and evidence in the cause". A few documents were omitted from the printing. No effort at all was made to prevent duplications, to exclude immaterial matter, or abbreviate documents, as required by Federal Rule of Civil Procedure 75(e), 28 U. S.C.A. following section 7230. Of the first 155 pages of the printed record 62 are pleadings, 13 the deposition of Gillette. The remaining 80 pages are worthless to the appeal. The minutes of the trial are sent up and printed, though everything in them is in the stenographic report. Appellee's two motions for summary judgment and the affidavits and orders on them are not material. We find 95 pages of the stenographic report taken up with objections, argument, and rulings, as to which no error is assigned. Though important passages in directors' minutes were read into the stenographer's report, 40 pages of such minutes are printed in full, which we had to read to see there was nothing else in them. Fifteen photostats of Gillette's stock certificates are included, though the only important thing about them is their number and that all are indorsed in blank, as was fully testified. For disregard of Rule 75(e) we will allow appellant only one-half costs for transcript and printing.

The decree is set aside and the cause remanded for a new trial.

Judgment reversed.