### THE POCHASSET.

### MANSON v. MILLER et al.

(Circuit Court of Appeals, First Circuit. January 15, 1924.)

#### No. 1644.

1. **Admiralty ⬤⟹117—Appeal in admiralty to Circuit Court of Appeals is trial de novo.**

   In the Circuit Court of Appeals, an admiralty appeal is a trial de novo.

2. **Seamen ⬤⟹29(5)—Evidence held not to charge ship with improper treatment of injured seaman.**

   Charges that a ship did not give a seaman with a broken leg prompt and proper care, and that it was responsible for nonsuccess of his treatment in a hospital, *held* not sustained by the evidence.

3. **Seamen ⬤⟹11—Extent of ship's duty to "cure" stated.**

   The duty to "cure" which a ship owes to an injured seaman means proper medical care for a reasonable time, and not positive cure, which may be impossible.

   [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Cure.]

⬤⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**4. Seamen ⊙⟶29(5)—Evidence held to show ship had discharged duty to cure, and that further operation not advisable.**

On libel against a ship for injuries to a seaman, evidence that after two operations his broken leg did not properly unite *held* sufficient to show that a further operation was not likely to effect a cure or substantial improvement, and that the ship's duty had been performed, especially in view of evidence that seaman's own refusal to remain quiet, etc., was in part, at least, the cause thereof.

Appeal from the District Court of the United States for the District of Rhode Island; Arthur L. Brown, Judge.

Libel in admiralty by Alexander Manson against the schooner Pochasset for personal injuries. From the decree of the District Court (281 Fed. 874), libelant appeals in forma pauperis. Affirmed.

Silas B. Axtell, of New York City, for appellant.

Alexander L. Churchill, of Providence, R. I. (Wilson, Churchill & Curtis, of Providence, R. I., on the brief), for appellees.

Before BINGHAM, JOHNSON, and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge. This is a libel in rem to recover for personal injuries suffered by the appellant, who, on July 2, 1914, fell through an open hatch into the hold of the schooner Pochasset.

The Pochasset was a schooner 112 feet long, bound up the Hudson river to Albany as a part of a tow of 2 schooners and 26 barges. Manson was shipped as cook in the afternoon of July 1, while the Pochasset was in the stream off New York City. He went on board with the captain in the early evening, and turned in about 9 o'clock. He testified to the effect that he rose about 4 o'clock to get breakfast; that he went forward to the galley or kitchen; that he struck his foot against something, and fell through the open hatch to the bottom of the hold. His testimony is confusing, inconsistent, and not altogether credible. About 6 in the morning, the captain found him there, practically helpless. The captain then rigged a tarpaulin with ropes, placed Manson upon it, and hoisted him to the deck. He was then put into the captain's bunk, and the captain did what he could to make him comfortable. The captain testified that he did not then know that Manson's leg was broken.

The Pochasset was about 750 feet in the rear of the convoying tug. The captain set his flag to signal the tug, and also tried repeatedly by megaphone to hail it, but did not succeed. At that time the tow was a little above Newburg, and proceeding very slowly against an ebb tide. Between 2 and 3 o'clock in the afternoon, another tug, bound down the river, saw the Pochasset's distress flag, and drew up alongside the schooner. Manson was then lowered from the schooner to the tug, and taken to Newburg; the captain of the Pochasset going with him. On telephone communication, an ambulance was sent down from St. Luke's Hospital, by which Manson was conveyed to the hospital, reaching there about 3 o'clock in the afternoon. Examination at the hospital disclosed that the right femur was broken.

There was much evidence that Manson was an unruly and difficult patient. He is described as obstreperous. His broken bone did

not unite. There was "nonunion and overlapping, with great deformity," so that on September 26, 1914, the surgeon operated, and put Manson into a plaster cast from the toes to the waist. He remained at the hospital until June 7, 1915. He was then discharged, but he was not cured. In August, 1915, he went to the Sailors' Snug Harbor, a charitable institution, where he was at the time of the trial. While there, another unsuccessful operation was performed upon his leg. But, at the time of the trial, about 8 years after the injury, there was still an open wound, discharging pus; the leg was much shortened and badly bowed. It is probable that he is permanently incapacitated for his former work as seaman or ship's cook—possibly he may continue to need the aid of charity. But the record does not show that his general health is impaired, or that he is incapable of such physical labor as may be performed by a strong man, with one leg partially disabled.

The District Court concluded upon the whole case that the only liability of the claimant was for care, maintenance, and wages, as to which the claimant concedes liability, as follows:

To St. Luke's Hospital ........................................... $519.00
To Dr. C. E. Townsend ............................................. 50.00
And to wages to end of voyage ..................................... 50.00

In all ........................................................... $619.00

In forma pauperis, the libelant appealed to this court.

While error is assigned, on the ground that the "damages were occasioned by reason of the unseaworthiness" of the Pochasset, this contention is not urged in the appellant's careful and elaborate brief. If not waived, as we might properly hold, we agree with the court below that it cannot be sustained.

[1] The appellant's proposition, that in this court an admiralty appeal is a trial de novo, is not open to controversy. Consolidation Coastwise Co. v. Conley, 250 Fed. 679, 163 C. C. A. 25; Irvine v. The Hesper, 122 U. S. 256, 7 Sup. Ct. 1177, 30 L. Ed. 1175; City of Norwich (C. C. A.) 279 Fed. 687; Anderson v. Steamship Kalfarli (C. C. A.) 277 Fed. 391; The John Twohy, 255 U. S. 77, 41 Sup. Ct. 251, 65 L. Ed. 511. Recognizing the duty thus incumbent upon us, we have carefully read and considered the voluminous typewritten record, much of which is taken up with medical aspects of the case, having little, if any, bearing upon the issues before us.

[2] The appellant's main contention is that the nonunion of the bone in Manson's leg was "caused to a considerable extent by the long delay in getting the appellant to the hospital." We agree with the court below that the evidence does not sustain this contention. The overwhelming weight of the medical testimony accords with what would be the ordinary common-sense view of the layman—that the delay of a few hours before Manson was taken to the hospital did not affect his chance of a complete recovery. Nor should we be able to find that the captain of the schooner was derelict in not getting Manson more quickly to the hospital. The schooner was some 750 feet behind the tugboat; the captain tried in vain by flag signal and megaphone to communicate with the tug. He did not even know that

Manson's leg was broken. There was nothing in his apparent condition to indicate to the captain that he was endangering Manson's prospects of full recovery by waiting, as he did, until another tug going down the river observed the distress signal. It would have been very difficult, if not impossible, for the captain to take Manson to Newburg in the small boat the schooner carried. ·

We are also constrained to agree with the court below that there is nothing in the suggestion, hardly urged now in the appellant's brief, that the captain was culpable in allowing Manson to get an excessive amount of whisky from some one on one of the other barges in the tow. The captain denies knowing that Manson got any whisky. Apart from that, the evidence utterly fails to support the proposition that, as a result of excessive whisky, then furnished, Manson by thrashing around injured his leg and its prospects of ultimate union.

On the whole, we conclude, as did the court below, that the schooner's master exercised proper and humane care in getting the injured seaman to a suitable hospital within reasonable time.

[3] The other contention urged is that the court below erred in "not making an allowance for an operation to cure the appellant as nearly as possible." In support of this contention, appellant's counsel have, with commendable zeal for their unfortunate client, made an exhaustive collection and analysis of the cases which most strongly emphasize the duty of maintenance, care and cure of sick or injured seamen. The general principle is of course, as stated in the quotation made by appellant's learned counsel from the opinion of Mr. Justice Brown in The Iroquois, 194 U. S. 240, 24 Sup. Ct. 640, 48 L. Ed. 955, as follows:

"The duty to provide proper medical treatment and attendance for seamen falling ill or suffering injury in the service of the ship has been imposed upon the ship owners by all maritime nations. * * *

"What is the measure of the master's obligation in cases where the seaman is severely injured while the ship is at sea has been made the subject of discussion in several cases; but each depends so largely upon its own particular facts that the rule laid down in one may afford little or no aid in determining another, depending upon a different state of facts. * * *

"Each case must depend upon its own circumstances, having reference to the seriousness of the injury, the care that can be given the sailor on ship board, the proximity of an intermediate port, the consequences of delay to the interests of the ship owner, the direction of the wind and the probability of its continuance in the same direction, and the fact whether a surgeon is likely to be found with competent skill to take charge of the case."

And the duty to cure, of course, does not mean that the ship becomes an insurer; it means, as laid down by the Circuit Court of Appeals for the Third Circuit in The Mars, 149 Fed. 729, 731, 79 C. C. A. 435, 437, "proper care of the injured seaman and not a positive cure which may be impossible." This duty has also been limited by the words, "at least so far as the ordinary medical means extend." The Kenilworth, 144 Fed. 376, 75 C. C. A. 314, 4 L. R. A. (N. S.) 49, 7 Ann. Cas. 202. Also, the ordinary medical assistance and treatment in cases of injury and acute diseases for a reasonable time. The W. L. White (D. C.) 25 Fed. 503.

[4] Applying this rule to the facts in this case, we reach the same result as did the District Court: That the ship's duty is performed in furnishing, as the decree below requires it to furnish—hospital and medical care of the libelant for a period of more than 11 months at an expense of $569, besides a month's wages.

The record does not warrant imposing a further burden upon the libelee, for at least two reasons:

(1) Because the evidence does not warrant a finding that a further operation would be reasonably likely to effect a cure or substantial improvement in the appellant's condition. While the evidence is, on that point, in conflict, we think the weight of the evidence is that a further operation is not desirable.

(2) Because the evidence leaves us in grave doubt as to whether the appellant's condition is not, at least in large part, his own fault, due to his unruly interference with the bandages upon his limbs, and his refusal to remain quiet in order to give the fractured bone an opportunity to knit.

Without further elaboration, we think the decree below must be affirmed; but, as the appeal is here in forma pauperis, it may be without costs.

The decree of the District Court is affirmed.